IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ELLIS CLAY HOLLIS,

    Petitioner,                             No. CIV S-04-2574 MCE GGH P

    vs.

DAVID L. RUNNELS,

    Respondent.                          <u>FINDINGS AND RECOMMENDATIONS</u>

    _____/

I. <u>Introduction</u>

        Petitioner is a state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2002 conviction for residential burglary (Cal. Penal Code § 459) (count one), residential robbery (Cal. Penal Code § 211) (count two), seven counts of forcible rape (Cal. Penal Code § 261(a)(2) (counts three through nine), and three counts of forcible oral copulation (Cal. Penal Code § 288a(c)(2) (counts ten through twelve).

        It was also found true that 1) as to count one, petitioner personally used a deadly or dangerous weapon, not being an element of the offense, within the meaning of Cal Penal Code § 12022(b)(1); 2) as to counts three through twelve, petitioner personally used a deadly weapon within the meaning of Cal. Penal Code §§ 12022.3(a) and 667.61(a), (b), (c) and (e)(4),

1

committed the offenses during the commission of a burglary within the meaning of Cal. Penal Code § 667.61(b), (c), and (e)(2), and committed the offenses during the commission of a burglary with the intent to commit forcible sex offenses within the meaning of Cal. Penal Code § 667.61(c).

The court also found true the allegations that 1) petitioner had a prior conviction for attempted robbery, a serious felony within the meaning of Cal. Penal Code § 667(a) and therefore came within the provisions of Cal. Penal Code § 667(b)-(I), and Cal. Penal Code § 1170.12; and 2) served two prior prison terms within the meaning of Cal. Penal Code § 667.5(b).

Petitioner was sentenced to 50 years to life with the possibility of parole plus a determinate sentence of 248 years.

This action is proceeding on the amended petition filed October 15, 2005, as to two claims: 1) insufficient evidence; 2) trial court violated petitioner's right to due process by allowing improper impeachment. After carefully reviewing the record, the court recommends that the petition be denied.

II. <u>Anti-Terrorism and Effective Death Penalty Act (AEDPA</u>

The AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential standards of review to be used by a federal habeas court in assessing a state court's adjudication of a criminal defendant's claims of constitutional error. <u>Moore v. Calderon</u>, 108 F.3d 261, 263 (9th Cir. 1997).

In <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d). Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court. There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law. <u>Id</u>. at 1519. "Contrary to" clearly established law applies to two situations: (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a

Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue. Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000). It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions. While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at 1522 (emphasis in original). The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority. Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision. Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002). Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority. Id. An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred. Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003). Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts. Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue. "Independent review of the record is not de novo review of the

constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

The California Court of Appeal was the last state court to issue a reasoned opinion addressing petitioner's claims. Respondent's Lodged Documents Nos. 4, 5. Accordingly, the court considers whether the denial of these claims by the California Court of Appeal was an unreasonable application of clearly established Supreme Court authority. Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000) (when reviewing a state court's summary denial of a claim, the court "looks through" the summary disposition to the last reasoned decision).

III. Discussion

    A. Insufficient Evidence

Petitioner argues that his convictions for seven counts of forcible rape and three counts of forcible oral copulation were not supported by sufficient evidence. Petitioner argues that, at best, the evidence supported convictions for five counts of forcible rape and two counts of forcible oral copulation.

When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that upon the record evidence adduced at trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found "the essential elements of the crime" proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Under Jackson, the court reviews the entire record when the sufficiency of the evidence is challenged on habeas. Adamson v. Ricketts, 758 F.2d 441, 448 n. 11 (9th Cir. 1985), vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987). It is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts." Jackson, 443 U.S. at 319, 99 S. Ct. at 2789. "The question is not whether we are personally convinced beyond a reasonable

doubt. It is whether rational jurors could have reached the same conclusion that these jurors reached." Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).

If the trier of fact could draw conflicting inferences from the evidence, the court in its review will assign the inference that favors conviction. McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994). The fact that petitioner can construct from the evidence alternative scenarios at odds with the verdict does not mean that the evidence was insufficient, i.e., that no reasonable trier of fact could have found the conviction scenario beyond a reasonable doubt.

> In reviewing the sufficiency of the evidence supporting a conviction, we search the record to determine "whether a reasonable jury, after viewing the evidence in the light most favorable to the government, could have found the defendants guilty beyond a reasonable doubt of each essential element of the crime charged." United States v. Douglass, 780 F.2d 1472, 1476 (9th Cir.1986). *The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict.* United States v. Fleishman, 684 F.2d 1329, 1340 (9th Cir.), cert. denied, 459 U.S. 1044, 103 S. Ct. 464, 74 L. Ed.2d 614 (1982); United States v. Federico, 658 F.2d 1337, 1343 (9th Cir.1981), overruled on other grounds, United States v. De Bright, 730 F.2d 1255, 1259 (9th Cir.1984) (en banc).

United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991)(emphasis added).

Superimposed on these already stringent insufficiency standards is the AEDPA requirement that even if a federal court were to initially find on its own that no reasonable jury should have arrived at its conclusion, the federal court must also determine that the state appellate court not have affirmed the verdict under the Jackson standard in the absence of an unreasonable determination. Juan H. v. Allen, 408 F.3d 1262 (9th Cir. 2005).

To put petitioner's claim in context, the court will set forth the factual summary and discussion of the insufficiency of the evidence claims contained in the opinion of the California Court of Appeal:

> A man later identified as defendant grabbed Maria G. from behind when she walked into her bedroom just before midnight on July 8, 2001. Armed with a knife taken from the kitchen, he threatened to hurt her if she made any noise. Defendant demanded that Maria G. take off her clothes and give him her money. He took coins, cash, and an ATM card at knifepoint.

After taking the money, defendant put down the knife, unfastened his pants, and exposed his partially erect penis.  He got on top of Marcia G., who was lying on her back across the bed, and put his penis inside her vagina.  She felt sick, angry and scared, but did not try to resist because she was afraid that defendant would kill her.

Defendant pulled his penis out of Marcia G.'s vagina, made her turn onto her stomach, unsuccessfully tried to put his penis in her anus, and finally put his penis into her vagina a second time.  Defendant's penis kept falling out, and he asked her to put it back in, but Marcia G. told him she could not reach it.  Defendant put his penis back in her vagina each of the three or four times it fell out while she was on her stomach.

At that point, defendant told Marcia G. to turn over on her back again, and suck his penis.  He put his penis inside her mouth and pushed it in and out.

Defendant had Marcia G. lie on the bed on her back, and he put his penis inside her vagina again.  His penis fell out, and he put it back in her vagina two to four times.

Defendant told Marcia G. to suck his penis again.  Each time he put his penis inside her mouth, it fell out.  This happened two or three times.

Finally, defendant pulled up his pants, picked up the knife, and cut the telephone cords.  He collected jewelry and keys from Marcia G. before tying her up and leaving the apartment.

Sacramento County Sheriff's deputies responded to Marcia G.'s emergency call at 12:24 a.m.  Using the description she provided, they detained defendant a short distance away.  Marcia G. identified him as her attacker in a field show-up.  She also identified the missing jewelry, money, and key chain which were found in defendant's possession.

Physician's assistant George Anderson examined Marcia G. at UC Davis Medical Center after the field show-up.  She told Anderson that defendant had penetrated her vagina approximately 12 times, and forced her to orally copulate him approximately four times.

Defendant testified in his own defense, blaming the sexual assault on another man named Calvin.  He said he obtained Marcia G.'s jewelry and other possessions from Calvin in payment for drugs.  Defendant acknowledged making an incriminating statement to police officers that morning of his arrest, but testified at trial that most of his earlier statement was false.

*****

Defendant argues he was denied his constitutional rights to due process and a fair trial because the evidence supported conviction of only five of the seven counts of forcible oral rape and two of the three counts of forcible oral copulation.  Specifically, defendant maintains that Marcia G.'s testimony was "equivocal as to the number of penetrations...."  With respect to forcible rape counts, he says "[t]he

context of the testimony suggests that the 'three or four times' and 'two to four times' he 'put [his penis] back in' overlapped the penetrations." As to the counts of forcible oral copulation, defendant cites Marcia G.'s testimony that his penis fell out of her mouth "two or three times," and simply argues the evidence supports only two instances of oral copulation.

*****

"The essential guilt of rape consists in the outrage to the person and feelings of the victim of the rape. *Any sexual penetration, however slight, is sufficient to complete the crime.*" (§ 263, emphasis added; People v. Karsai (1982) 131 Cal.App.3d 224, 231, overruled on other grounds in People v. Jones (1988) 46 Cal.3d 585, 600, fn. 8.)

Noting the similarities in the language and origin of rape and sodomy statutes, the Supreme Court applied this principle to section 289, sexual penetration by a foreign object, and explained that "a *new and separate* violation of section 289 is 'completed' each time a *new and separate* 'penetration, however slight' occurs." (People v. Harrison (1989) 48 Cal.3d 321, 329, orig. emphasis.) The uncorroborated testimony of the victim is sufficient to sustain a conviction. (People v. Akey (1912) 163 Cal. 54, 56.)

Marcia G. testified defendant penetrated her vagina with his penis eight and eleven times. Her trial testimony was consistent with her report to the examining physician's assistant that defendant penetrated her vagina approximately 12 times. The details of Marcia G.'s testimony support the inference that there were at least seven separate, not "overlapping" penetrations of her vagina. We therefore conclude there is sufficient evidence to support defendant's conviction of seven counts of rape.

Oral copulation involves any contact, however, slight, between the mouth of one person with the sexual organ of another. Penetration of the mouth is not required. (§ 288a; People v. Grim (1992) 9 Cal.App.4th 1240, 1243.)

Marcia G. testified that defendant forced her to orally copulate him three or four times. He put his penis in her mouth when she was on her back then raped her between three and five times. Defendant told her to suck his penis again, putting it in her mouth. When his penis fell out, defendant put it back into Marcia G.'s mouth between two and three times. She told the examining physician's assistant that defendant forced her to orally copulate him approximately four times. This record supports defendants' conviction of three counts of forcible oral copulation.

Respondent's Lodged Document 4, appendix A, pp. 3-7.

Petitioner argues, in essence, that the California Court of Appeal miscounted the number of times Marcia G. testified that petitioner penetrated her and orally copulated her. Petitioner also argues that Marcia G.'s approximations are not sufficient evidence to sustain each conviction.

Petitioner's counsel has interpreted Marcia G.'s testimony as indicating that petitioner inserted his penis into her vagina five times and into her mouth two times. The court does not agree with this interpretation and will quote Marcia G.'s relevant testimony below:

Q: When he exposed his penis, could you see it?

A: Yes.

Q: Was it erect?

A: Not really.

Q: And after he pulled his penis out of his pants, what did he do then?

A: He put it in my vagina.

Q: And where was he in relation to you when he did this?

A: On top of me.

Q: After he put his penis in your vagina, what did he do?

A: He just started having sex.

Q: Did he say anything to you when he did this?

A: No.

Q: Did he ask you any questions?

A: After a couple of seconds, he asked me how long it had been since I had it.

Q: Since you had what?

A: "It." That's what he said, "it."

Q: And this is while he was on top of you?

A: Yes.

Q: After he put his penis in your vagina, he was on top of you, what was the very next thing that happened?

A: He pulled my knees up to my shoulders.

Q: What did he do?

A: He just kept pushing.

1   Q: Pushing what?

2   A: (Pause.)

3   Q: What was he pushing, Marcia?

4   A: His penis, inside of me.

5   Q: How were you feeling when this was going on?

6   A: Sick, in pain, angry, scared.

7   Q: Did you try and resist him in any way?

8   A: Not really, no.

9   Q: Why not?

10  A: I was afraid.

11  Q: What were you afraid of?

12  A: That he would kill me.

13  Q: Did he finally stop putting his penis in your vagina in that position?

14  A: Yes.

15  Q: When he stopped doing that, did he make you do something else?

16  A: He had me turn over.

17  Q: Which way did he have you turn over?

18  A: And then he started again.

19  Q: How did he have you turn over, Marcia?

20  A: On my stomach.

21  Q: When you say "he started again," when you were on your stomach, what did he do?

22  A: He was trying to have sex rectally, but he missed.

23  Q: He missed your rectum?

24  A: Yeah.

25  Q: And after he missed your rectum, did he put his penis somewhere else?

26  A: In my vagina.  It kept falling out.  He told me to put it back in.  I told him I couldn't reach it.

1  Q: And how many times did his penis go in, fall out and he put it back in again?
2  A: Three, maybe four.
3  Q: Was this all while you were on your stomach?
4  A: Yes.
5  Q: Was he saying anything to you as he was taking his penis out and putting it back in your
6  vagina?
7  A: No.
8  Q: And after he penetrated your vagina three or four different times, what was the next thing that
9  happened?
10 Petitioner's Counsel: Objection, leading, assumes facts not explicitly in evidence.
11 Court: The objection is sustained.
12 Q: After he placed his penis in your vagina the first time, did you remain on your stomach?
13 Petitioner's Counsel: Objection, asked and answered.
14 Court: Objection is overruled.
15 A: Yes.
16 Q: And then after he put it in the first time, did it come fully out of your vagina?
17 A: Yes.
18 Q: Did he place it back in your vagina again?
19 A: Yes.
20 Petitioner's Counsel: Objection, leading.
21 Court: Objection is overruled.
22 Q: How many times did his penis come out and go back in your vagina while you were on your
23 stomach?
24 A: The first time, three, maybe four.
25 Q: And after about three or four times when you were on your stomach, what did he do then?
26 A: Had me turn over.

1  Q: And when he had you turn over, what position did he have you get into?
2  A: He told me to suck it.
3  Q: Told you to suck it, is that it?
4  A: Yes.
5  Q: And when he told you to suck it, what did he do?
6  A: He stuck it in my mouth.
7  Q: When you say "he stuck it in your mouth," what did he stick in your mouth?
8  A: His penis.
9  Q: What did you do when he stuck it in your mouth?
10 A: Nothing.  I just sat there.
11 Q: What did he do after he stuck it in your mouth?
12 A: Kept pushing it in and out and sort of holding it.
13 Q: When he was doing this, did he still have socks on his hands?
14 A: Yes, I think so.
15 Q: Did you try and resist him when he was doing this?
16 A: No.
17 Q: And why not?
18 A: Because the knife was still there.
19 Q: And after he put his penis in your mouth, was it fully erect?
20 A: No.
21 Q: Did anything come out of his penis when it was in your mouth?
22 A: No.
23 Q: How long did this go on?
24 A: The first time?
25 Q: Yes.
26 A: Ten seconds, maybe.

1  Q: After he had his penis in your mouth for about ten seconds, what did he do then?
2  A: He had me lay back up in bed and tried to have sex again.
3  Q: When you say "lay back up on the bed," what position?
4  A: On my back.
5  Q: And after you were on your back, what did he do?
6  A: Put his penis in my vagina.
7  Q: Did he take his penis out of your vagina, or did it—
8  A: It fell out. He put it back in.
9  Q: How many times did his penis come out of your vagina and then he put it back in again when
10 you were on the bed?
11 A: Two, three, four.
12 Q: And after he put his penis in your vagina two to four times as you were in that position, what
13 did he do then?
14 A: Told me to suck it again.
15 Q: What position were you in this time when—
16 A: Sitting up on the bed.
17 Q: And what did he do after he told you to suck it?
18 A: He put it in, and it would fall out.
19 Q: Was his penis fully erected this time?
20 A: No.
21 Q: And as he put it in your mouth, you said it fell out. Did he put it back in your mouth after it
22 fell out?
23 A: Yes.
24 Q: How many times did he put it in your mouth?
25 A: Two or three.
26 Q: And after he put his penis in your mouth two or three times, what did he do then?

1  A: Pulled up his pants.
2  Q: Did he penetrate your vagina again with his penis after it was in your mouth the second or
3  third time?
4  A: I don't remember anymore.
5  RT at 179-184.

      To summarize, Marcia G. testified that petitioner put his penis in her vagina at three different times. At the beginning of this incident, petitioner put his penis in her one time when she was lying on her back. Petitioner then put his penis in her vagina three or four times when she was lying on her stomach. Petitioner then put his penis in her vagina two, three or four times when she was on her back again. At most, petitioner put his penis in Marcia G.'s vagina nine times. At the least, petitioner put his penis in Marcia G.'s vagina six times.

      As for oral copulation, Marcia G.'s trial testimony indicates that petitioner put his penis in her mouth two different times. The first time, he put his penis in her mouth once. The second time, petitioner put his penis in her mouth two to three times. Therefore, at most the oral copulation occurred four times, and at the least, three times.

      Despite Marcia G.'s inability to recall the exact number of times petitioner penetrated her vagina and orally copulated her, the jury's finding that he raped her seven times and orally copulated her three times was not irrational. Petitioner has not demonstrated that based on the record described above, viewed in the light most favorable to the prosecution, no rational trier of fact could have found seven counts of forcible rape and three counts of forcible oral copulation.

      The denial of this claim by the California Court of Appeal was not an unreasonable application of clearly established Supreme Court authority. Accordingly, this claim should be denied.

25  \\\\\
26  \\\\\

B.  Improper Impeachment

Petitioner argues that the trial court improperly allowed him to be impeached with his 1994 conviction for attempted robbery. The California Court of Appeal found that this claim was waived by counsel's failure to object to admission of this prior conviction. Respondent's Lodged Document No. 4, appendix A, p. 8. Because the state court denied this claim on procedural grounds, respondent argues that this claim is procedurally barred. See Respondent's Lodged Document No. 5(unreasoned opinion of California Supreme Court denying petition for review); Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S.Ct. 2590 (1991) (where there is no reasoned decision from the state's highest court, this court looks through to the underlying reasoned lower court decision).

If a federal constitutional claim is expressly rejected by a state court on the basis of a state procedural rule that is independent of the federal question and adequate to support the judgment, the claim is procedurally defaulted. House v. Bell, 547 U.S. 518, ___, 126 S. Ct. 2064, 2076 (2006) ("[a]s a general rule, claims forfeited under state law may support federal habeas relief only if the prisoner demonstrates cause for the default and prejudice from the asserted error[;]" citing Murray v. Carrier, 477 U.S. 478, 485, 106 S.Ct. 2639 (1986); Engle v. Isaac, 456 U.S. 107, 129, 102 S. Ct. 1558 (1982); Wainwright v. Sykes, 433 U.S. 72, 87, 97 S. Ct. 2497 (1977)); see also Coleman v. Thompson, 501 U.S. 722, 729-730, 111 S. Ct. 2546, 2554-2555 (1991); Bennett v. Mueller, 322 F.3d 573, 580 (9th Cir. 2003). Habeas review of procedurally defaulted claims is barred unless the petitioner demonstrates cause for the procedural default and actual prejudice, or that the failure to consider the claims will result in a miscarriage of justice. Coleman, 501 U.S. at 750, 111 S. Ct. at 2565.[1]

---

[1] "Out of respect for the finality of state-court judgments federal habeas courts, as a general rule, are closed to claims that state courts would consider defaulted. In certain exceptional cases involving a compelling claim of actual innocence, however, the state procedural default rule is not a bar to a federal habeas corpus petition. See Schlup v. Delo, 513 U.S. 298, 319-322, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995)." House v. Bell, supra, 126 S. Ct. at 2068.

14

A procedural default must be firmly established in the state law and regularly followed. Cooper v. Brown, 510 F.3d 870, 924 (9th Cir. 2007). Respondent has the initial obligation to raise the default, and if so, petitioner must allege specific facts demonstrating that the bar has not been firmly established or regularly followed. If petitioner meets his burden, the question of firmly established or regularly followed must be demonstrated by respondent. Id. In this case, petitioner chooses to argue as if the doctrine of procedural default does not exist at all. Rather, she argues that this court can reach questions of fundamental constitutional errors regardless of any default, citing Jackson v. Denno, 378 U.S. 368 (1964). However, there is simply too much Supreme Court precedent to the contrary to seriously question the application of the doctrine to any alleged constitutional error. Since petitioner does not raise specific facts to question whether the waiver on failure to object rule is firmly established and regularly followed, the doctrine applies.

Petitioner's claim regarding the trial court's admission of his 1994 prior conviction for impeachment is procedurally defaulted unless petitioner can demonstrate cause and prejudice or a miscarriage of justice. See Paulino v. Castro, 371 F.3d 1083, 1092-93 (9th Cir. 2004) (California's contemporary objection rule precludes federal habeas review). Petitioner makes no showing regarding cause, prejudice or miscarriage of justice. Accordingly, this claim is procedurally barred.

Nevertheless, the court finds that petitioner would be unable to show prejudice or a fundamental miscarriage of justice based on the reasoning of the California Court of Appeal in denying the related ineffective assistance of counsel claim:

> Citing People v. Beagle (1972) 6 Cal.3d 441 (Beagle), People v. Castro (1992) 4 Cal.4th 284 (Castro), and People v. Wheeler (1992) 4 Cal.4th 284 (Wheeler), defendant contends the court deprived him of due process and a fair trial when it allowed the prosecution to impeach him with the 1994 conviction. He argues for the first time on appeal that "it was error for the trial court to admit [his] 1994 conviction for attempted first degree robbery, because it was substantially similar to count 2, for residential robbery, and it was recent."
>
> *****

> "Under Castro the trial courts have broad discretion to admit or exclude prior convictions for impeachment purposes...The discretion is as broad as necessary to deal with the great variety of factual situations in which the issue arises, and in most instances the appellate courts will uphold its exercise whether the conviction is admitted or excluded." (People v. Collins (1986) 42 Cal.3d 378, 389 (Collins).) In exercising its discretion, the trial court should consider the four factors first set forth in Beagle, supra, 6 Cal.3d 441: "'(a) whether the prior conviction reflects adversely on an individual's honesty or veracity; (2) the nearness or remoteness in time of a prior conviction; (3) whether the prior conviction is for the same or substantially similar conduct to the charged offense; and (4) what the effect will be if the defendant does not testify out of fear or being prejudiced because of impeachment by prior convictions. [Citations.]' [Citation.]" (People v. Green (1995) 34 Cal.App.4th 165, 182.)
>
> Attempted robbery is a crime of moral turpitude. (Collins, supra, 42 Cal.3d at p. 395; People v. Rodriguez (1986) 177 Cal.App.3d 174, 177.) Prior convictions involving moral turpitude are relevant to a witness's honesty and veracity because they may suggest a willingness to lie. (Wheeler, supra, 4 Cal.4th at p. 295; Castro, supra, 38 Cal.3d at pp. 314-315.) However, even prior convictions involving moral turpitude are inadmissible as a matter of law in "unusual cases in which the appellate court concludes on the particular facts before it that the trial court could have exercised its discretion only in favor of exclusion, i.e., that it would have been an abuse of discretion if the trial court had admitted the conviction." (Collins, supra, at p. 390.)
>
> Defendant cites People v. Tamborrino (1989) 215 Cal.App.3d 575, 590, and concedes that after the passage of Proposition 8 (Cal. Const., art. I, § 28), there is no absolute limitation on the use of an identical prior for purposes of impeachment. It is simply one of the four Beagle factors the court considers in exercising its discretion. (People v. Castro (1986) 186 Cal.App.3d 1211, 1216.)
>
> Nothing in the record suggests this is an "unusual case" where "the trial court could have exercised its discretion only in favor of exclusion..." (Collins, supra, 42 Cal.3d at p. 390.) The 1994 conviction of attempted first degree robbery was probative of defendant's honesty and veracity, it was not remote in time, and its admission did not prevent defendant from testifying at trial. Thus, defense counsel cannot be faulted for declining to object to admission of the 1994 prior for purposes of impeachment. Moreover, defendant suffered no prejudice as result of counsel's failure to object. Defendant testified, acknowledged the fact of the prior conviction for attempted first degree robbery, but did not reveal the facts underlying the conviction. It was one of three prior felony convictions revealed to the jury. Indeed, it is likely defendant's credibility suffered more from his own inconsistent testimony regarding Calvin and the events of the evening of July 8, 2001, than it could possibly have suffered from admission of the 1994 prior.

Respondent's Lodged Document no. 4, Appendix A, pp. 8-11.

Based on the reasoning of the California Court of Appeal, this court would not find that petitioner suffered prejudice as a result of counsel's failure to object or that a

16

1  miscarriage of justice will occur if the court does not consider this claim.

2          For the reasons above, the court finds that petitioner's claim alleging that the trial court committed error by allowing him to be impeached with his 1994 conviction for attempted robbery is procedurally barred.

        Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

        These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: 02/21/08

        /s/ Gregory G. Hollows

        UNITED STATES MAGISTRATE JUDGE

holl2574.157